GEORGE vs. ST. L., I. M. & S. R'Y Co.

1. PLEADING: *No reply to mere answer.*

A plaintiff is not entitled to reply to an answer which contains no set-off, or counter-claim.

2. RAILROAD COMPANY: *Liability for injury to passengers: Negligence, when presumed.*

To the liability of a railway company as a passenger carrier, two things are requisite—that the company be guilty of some negligence or omission, which mediately or immediately produced or enhanced the injury; and that the passenger should not be guilty of any want of ordinary care and prudence which contributed to the injury.

*Prima facie,* when a passenger, being carried on a train, is injured without fault of his own, there is a legal presumption of negligence, which the carrier must remove by proof.

If a car is thrown from the track and crushed, and there is a broken rail the jury may infer negligence from these facts; and the *onus probandi* will be shifted to the carrier.

3. SAME : *Bound to utmost diligence.*

Railway carriers of passengers are bound to the utmost diligence whic'.
human skill and foresight can effect; and if injury occurs by reason of
the slightest omission in regard to the highest perfection of all the ap-
pliances of transportation, or the mode of management at the time the
injury occurs, the carrier is responsible.

4. INSANE PERSONS: *Contracts of, not void.*

Insane persons have no complete power of contract, but their contract- are
not, in general, absolute nullities.

APPEAL from *Clark* Circuit Court.

Hon. L. J. JOYNER, Circuit Judge.

*Witherspoon, Battle,* for appellant.

*J. M. Moore, contra.*

ENGLISH, C. J.   On the sixteenth of March, 1877, Bailey
R. George commenced this action in the circuit court of
Clark county, against the St. Louis, Iron Mountain and
Southern Railway company, the complaint alleging in sub-
stance :

That defendant was running and operating a line of rail-
way in this state, transporting passengers and freight, and
about the seventeenth of November, 1876, plaintiff pro-
cured and paid for a ticket on said railroad from Little
Rock to Texarkana, and got aboard of one of defendant's
trains, and while on said train, and seated in one of the
passenger cars, the said train, from the negligence of the
employés of said company, ran off the track, and the plain-
tiff thereby received a serious injury upon his head, which
caused him great pain for several months, and from which
he might never recover; damages laid at $5,000.

At the October term, 1877, the defendant corporation
filed an answer, containing three Code paragraphs :

1. Admitting that plaintiff took passage on its said rail-

George vs. St. L., I. M. & S. R'y Co.

road, as alleged in the complaint, and that the train ran off the track, as alleged, but denying that the same occurred by reason of the negligence or unskillfulness of defendant's servants or employés.

2. Alleging that, on the twenty-ninth of November, 1876, plaintiff, in consideration of the sum of one hundred dollars, at the time paid by defendant to him, did release defendant from all damage by him sustained by reason of the matters and things alleged in said complaint, and did at the time execute and deliver to defendant his writing releasing it from all liability, by reason thereof, and defendant herewith files said release, and sets up and pleads the same in bar of plaintiff's alleged cause of action.

3. Alleging that, on the —— day of ———, 1876, plaintiff and defendant, by way of compromise, and settlement of the matters and things alleged in said complaint, agreed that defendant should pay plaintiff the sum of one hundred dollars, and the plaintiff would accept the same in full and complete satisfaction of any liability that might accrue to him from defendant by reason of the injuries complained of; and, thereupon, defendant did pay plaintiff the sum of one hundred dollars, as was agreed by and between them.

The instrument pleaded as a release, by the second paragraph of the answer, and filed with it, follows:

"ARKADELPHIA, ARK., Nov. 29, 1876.

"In consideration of the sum of one hundred dollars, to us in hand paid, the receipt whereof is hereby acknowledged, we, Bailey George and E. J. George, his wife, hereby release unto the St. Louis, Iron Mountain and Southern Railway company, all damages sustained by, and all rights of action accruing to us, or either of us, by reason of injuries sustained, or expense, or loss incurred by us, or

either of us, by the wrecking, near Donaldson station, of the second section of passenger train No. 1, of said railway company, on the seventeenth day of November, 1876; W. A. Chambers being the conductor.

(Signed.)                              "B. R. GEORGE,
                                       "E. J. GEORGE.

"Signed in presence of
     " S. MORRISON,
     " C. D. HOBSON."

The plaintiff filed the following reply:

"Plaintiff says that it is probable that he did sign the receipt filed with defendant's answer, but charges that the same was executed when his mind was so affected, in consequence of the injury upon his head, that he did not know what he was doing, and he now has no recollection of signing the same, or receiving the money, and charges that he was *non compos* at the date of said instrument."

The reply was sworn to, and, during the trial, plaintiff was permitted to file an affidavit, about in the language of the reply.

On the trial, plaintiff testified, in substance, that about the seventeenth of July, 1876, he, with his family, was traveling in one of the passenger cars belonging to defendant, having paid his fare as a passenger on said railway from Little Rock to Texarkana, and was seated in said passenger car when, somewhere between Malvern and Arkadelphia, the car that he was in was thrown from the track and smashed, and he received a very severe wound on the head, from which his mind was so affected that he had no knowledge of what was transpiring, or what he did, for three or four weeks after the occurrence. That he suffered great pain from the wound, and was disabled from work or labor for about three months, and his labor was

worth, when well, about $1 per day. That he had no recollection of ever giving the railway company, or its agent, any receipt for $100, or any amount, in full satisfaction for damages, by reason of his injuries by said accident on said road, and did not recollect that he ever received any money from them.

That when he came to himself he learned from his wife that he had signed some sort of receipt, or paper, to said defendant, and went to its agent at Arkadelphia, Mr. Morrison, and asked to see it, and he said he had sent it off. Witness asked if he could give him a copy of it; he promised he would, but never did so, though he called upon him several times.

On cross-examination, he testified that he had never returned, or offered to return, the one hundred dollars that was paid his wife and himself by the defendant, and for which the receipt was given.

R. E. REAMS, witness for plaintiff, testified that plaintiff and his family were brought to his hotel, near the railroad depot, on the seventeenth of November, 1876; that plaintiff seemed to be very badly wounded on the head, and to be suffering a great deal. That he and his family remained at the house of witness from the seventeenth of November to the first of December, when his family went to Texas, and he remained until the sixth of January, 1877. Witness was in his room every day from the time he came until after the sixth of December, and some days he seemed not to be in his right mind, talked at random, and flighty, and sometimes he seemed to be rational.

That defendant, by its agents, paid the board of plaintiff and family, which was about $330.

DR. WALLIS, of Arkadelphia, testified that about the seventeenth of November, 1876, he and four other physi-

cians, were called, by agents of defendants, to attend upon a large lot of men, women and children, who had been wounded by an accident on the railway between Arkadelphia and Malvern. Dr. Dale and himself attended to plaintiff's wound, which was a severe scalp-wound—removing the scalp and soft part of the bone of the skull back. They drew it back to its place and sewed it up. Did not notice that his mind was much affected, but only saw him a few times, he being the patient of Dr. Dale. Saw plaintiff on the twenty-ninth of November, and his mind was clear. The railway company paid bill of witness for attending on the wounded.

STANTON testified that he was engineer on the train which was wrecked on the seventeenth of November. The rear cars ran off the track, were turned over, and badly broken up. The engine and baggage car remained on the track. Did not know what caused the accident. When he went back he found a broken rail. Did not know whether this was the cause, or some part of the rear cars giving way. There was no carelessness or negligence on the part of the men in charge of the train.

*Here plaintiff closed.*

Defendant read in evidence the release pleaded.

SOLOMON MORRISON, for defense, testified that he was agent for defendant at Arkadelphia, at the time of the running off of the train by which plaintiff was injured. He, as such agent, settled with plaintiff for the injury done him by the accident; paid him for the company $100, with the understanding that the company would also pay his board bill, doctor's bill and drug bill, while he was disabled, which were paid through witness. He settled with other parties who were injured at the same time, and then went to settle with plaintiff. There had

been a release drawn up for him to sign, in consideration of the receipt of $60. He declined to accept that amount. Witness then asked him what amount he would accept. He said he thought $100 would be about what was right. Witness told him he would telegraph Mr. Dudley his proposition immediately ; did so, and received in reply, " Pay Mr. George one hundred dollars." Witness then drew up a release with a consideration of $100, went over to plaintiff's room and paid him $100, and he and his wife signed the release. Mr. Hobson went with witness to the room, and was present during the whole transaction.

Plaintiff and wife seemed to understand what the payment of the money and the signing of the release were for. They made no objections to it, and seemed perfectly satisfied. Plaintiff was sitting up in the bed at the time he signed the paper. Witness saw no difference in his mental condition then and at any other time since. He seemed perfectly sane. The payment of the money and the signing of the release occurred about two weeks after the accident.

C. D. Hobson testified that he was present in plaintiff's room when the $100 was paid, and the release signed, and witnessed it. Plaintiff was sitting up in bed when he signed the receipt. His wife, and several other persons, whom he took to be members of his family, were present, and his wife also signed the paper. Witness was in the room twenty or thirty minutes, and plaintiff seemed to talk rational—seemed to be in his right mind; did not observe anything unusual in his deportment. Had not seen him before, and did not notice him particularly. Was conductor of one of defendant's trains, and was asked by Morrison to go with him to plaintiff's room and witness

the payment of the money and the execution of the release.

STANTON, called for defense, testified that he was engineer on the train that was wrecked; was running at the customary rate of speed for passenger trains. There was no carelessness or want of skill or negligence on the part of the employés in charge of the train. The conductor was a competent man.

DR. WALLIS testified that he was one of five physicians who were called upon by the attorney and agent of defendant to assess the probable damage by loss of time on account of injuries received, and, as he remembered, assessed plaintiff's at fifty or sixty dollars—supposing that this would cover the time he would probably be prevented from his usual occupation, the expense being borne by defendant.

H. W. McMILLAN, attorney at-law, testified in substance, that he submitted the proposition of defendant to pay plaintiff fifty or sixty dollars. His family were in the room, and a Mr. French, a friend of the family; and they all talked over the matter, mostly between Mr. French and the family, and it was decided that they would not take less than $100 for injuries to plaintiff. Plaintiff also talked about it, and witness did not notice that his mind was affected; he was sitting up in the bed, with his head bound up. The basis of the proposed settlement was that the company was to pay all expense incurred by persons who were injured—board bill, drug and physicians' bills, and such an amount for loss of time as would be assessed by a board of physicians (who were agreed upon), in view of the time the physicians thought would be required to cure them, and the value of the time. The doctors esti-

mated the amount that ought to be paid plaintiff at $50, and he refused to take it, but wanted $100.

JOHN M. MOORE testified that, as attorney for the railway company, he went to Arkadelphia on the next day after the accident, to arrange for and compensate the wounded for their injuries, and, with the representative of the injured parties, called upon five physicians in attendance to assess the probable damages, and they did so, and it was paid in most of the cases. Plaintiff's, as he remembered, was fixed at $50 or $60. Defendant was to pay the board of the injured parties, and for medical attention, medicine, etc.

The above being in substance all the evidence introduced at the trial, plaintiff moved the following instructions, which the court refused :

"1. If the jury find from the evidence that plaintiff received personal injuries while traveling upon the cars or railroad of defendant as a passenger, they will find for plaintiff such damages for the injuries as the proof in the case will justify, not exceeding the amount in the complaint.

"2. If the jury believe from the evidence that plaintiff's mind was in a state of derangement at the time he signed the release introduced by defendant, they will disregard the same, and find for plaintiff such damages as he has proven.

"3. That if they believe from the evidence that, in consequence of the injuries received by plaintiff, he was not of sound mind at the time the release was signed and executed, they will find for plaintiff."

Defendant moved five instructions, to all of which plaintiff objected. The court gave the first·and fifth, and refused the others. But part of the second and none of

the third and fourth are copied in the bill of exceptions, the clerk stating their loss.

The first and fifth given are as follows :

" 1. If the jury find from the evidence that the servants and employés of the defendant, in charge of the train at the time of the accident which produced the plaintiff's injuries, were not at the time of the accident guilty of any negligence or unskillfulness, they will find for the defendant.

" 5. If the jury find that plaintiff was at the time of signing the release suffering from temporary insanity, from which he has since recovered, it was his duty upon recovery, if he desired to repudiate the contract, to restore or offer to restore the money paid him by the defendant; and if he has not done so, they will find for the defendant."

The bill of exceptions states that during the argument of the instructions, plaintiff's attorney proposed that he would admit that the jury should allow defendant credit for the amount which defendant had paid, provided they should find any damages in favor of plaintiff for his injuries.

The jury returned a verdict in favor of defendant.

The plaintiff moved for a new trial on the grounds that the verdict was contrary to law and evidence, and that the court erred in refusing the three instructions moved by plaintiff, and giving the first and fifth moved for the defendant.

The court overruled the motion, and plaintiff took a bill of exceptions and appealed.

I. The answer setting up no set-off or counter-claim, appellant was not entitled to reply under the Code practice. *Gantt's Dig., secs. 4577-8-9.*

He should have filed the affidavit before the trial, im-

peaching the release pleaded by the second paragraph of the answer, and filed with it. *Ib., sec. 2495.*

Appellee complains that the court permitted him to file the affidavit during the progress of the trial, but as the verdict and judgment were in its favor, and it is not appealing, it was not prejudiced by the error, if any. The court doubtless may exercise discretion in such matters in furtherance of justice.

II. Passing, for the present, the question of negligence, the weight of evidence seems to be that appellant was not insane at the time he executed the release. He was the only witness that swore that he was insane at that time. Reames testified that some days he seemed not to be in his right mind, and at other times he appeared rational. He did not state that he was present when the release was signed, or what the condition of appellant's mind was on that day. The testimony of the attesting witness, and others, conduced to prove that he was not *non compos mentis* when he executed the release, and no fraud or imposition appears to have been practiced upon him by agents of appellee. The question of insanity, however, was for the jury, and if properly submitted to them by the court, they were the judges of the evidence.

III. As a proposition of law, the first instruction moved for appellant, and refused by the court, was not correct, because it ignored negligence. The complaint averred, and had to aver, negligence to be good pleading. *St. Louis, Iron Mountain and Southern Railway Company v. Yocum, ante.*

To the liability of the railway company, as passenger carriers, two things are requisite—that the company shall be guilty of some negligence or omision which mediately or immediately produced or enhanced the injury; and that

the passenger should not have been guilty of any want of ordinary care and prudence which contributed to the injury, etc. *2 Redfield Law of Railways, p. 223.*

It is a familiar rule, that what is essential to be alleged, must be in some mode, and by some kind of competent evidence, proved, if denied.

" The rule of responsibility differs from the rule of evidence. *Prima facie*, where a passenger, being carried on a train, is injured without fault of his own, there is a legal presumption of negligence, casting upon the carrier the onus of disproving it.    This is the rule when the injury is caused by defect in the road, cars or machinery, or by want of diligence or care in those employed, or by any other thing which the company can and ought to control as part of its duty, to carry the passengers safely ; but this rule of evidence is not conclusive.    The carrier may rebut the presumption, and relieve himself from responsibility, by showing the injury arose from an accident which the utmost skill, foresight and diligence, could not prevent." *Meir v. Pennsylvania Railroad, 64 Penn. State, 230,* and cases cited ; *Cooley on Torts, p. 663; Wharton Law of Negligence, sec. 661.*

Appellant proved that the car in which he was seated was thrown from the track and crushed, and that there was a broken rail.    The court should have charged the jury that they might infer negligence from these facts, and that thereby the *onus probandi* was shifted to appellee.

IV. The first instruction given for appellee was too narrow, because it confined the question of negligence to the servants and employés of the corporation in *charge of the train* at the *time of the accident*, when it might have been the result of previous negligence on the part of the company, or other employés than those in charge of the train

at the time of the accident and injury to appellant. What was the condition of the track; why was the rail broken, and when was it broken? Was the car badly constructed, or out of repair? The evidence is silent as to these matters.

Railways are not insurers of passengers, and not responsible for unavoidable accidents, but "the cases all agree that passenger carriers by railway are bound to the utmost diligence which human skill and foresight can effect, and that if injury occurs by reason of the slightest omission in regard to the highest perfection of all the appliances of transportation, or the mode of management at the time the damage occurs, the carrier is responsible." *2 Redfield Law of Railways, p. 219.*

V. The second and third instructions asked for appellant, and refused by the court, were, in substance, that if the jury believed, from the evidence, that his mind was in a state of derangement when he signed the release, or that in consequence of the injury he was not of sound mind, they should find for him. This was in effect assuming, upon the hypotheses stated, that the release was absolutely null and void, and incapable of ratification.

Persons who are insane have no complete power of contract. Yet their acts of this sort are not, in general, absolute nullities. *Bishop on Contracts, sec. 284.*

"There are cases," says MR. BISHOP, "which seem to hold, or in which the judges incautiously state the doctrine to be, that, where a contract is impeachable for insanity, it is absolutely void. And perhaps there may be circumstances in which this is so by the better doctrine. If the insanity is complete and profound, the law ought, in reason and justice, to be so held. But in most of the cases the insanity is, on the facts, only partial; and the contract is generally

40

·adjudged to be merely voidab!e by the insane person, or his legal representative, and, while not so avoided, binding on the other party. It may be ratified by the insane person on his restoration to reason. But, before ratification, if, for example, it is a deed of real estate, it conveys a seizin to the grantee." *Ib.*, *sec. 296*, and cases cited. *Allis v. Billings*, *6 Metcalf (Mass.)*, *417*.

If appellant was in fact not in his right mind when he executed the release, as he stated, it was not a case of such insanity as would render the contract absolutely null and void, so that he could not ratify it on becoming rational.

VI. The fifth instruction given for appellee, in effect, submitted to the jury the question whether or not appellant was suffering from temporary insanity when he signed the release, but declared, as a matter of law, that he could not recover unless he had restored or offered to restore to appellee the money paid him as a consideration for executing the release.

A similar proposition was disapproved in *Henry*, *ad.*, *v. Fine*, *23 Ark.*, *417*, where Brandon had made a bill of sale for a slave when insane, and his administrator brought replevin for the property.

In *Allis v. Billings*, *sup.*, the court said: "Adopting, as we do, the principle that the deed of an insane person is only voidable, this, while it gives the insane grantor full power and authority to avoid the deed, and thus furnishes full protection to him against all acts injurious to his interests, done while he was *non compos*, also entitles the other party to set up the deed, if he can show a ratification or adoption of it, by the grantor, after he is restored to a sound mind. If the grantor, when thus capable of acting, and with full knowledge of his previous acts, and of the nature and extent of them, will deliberately adopt and

ratify them; if he will knowingly, and in the exercise of his proper faculties, take the benefit of a contract made while he was insane; it is competent for him to do so. But the consequence will be to give force, effect, and validity to the contract, which was before voidable." See, also, *Arnold v. Richmond Iron Works, 1 Gray (Mass.), 413.*

Appellant testified that he had no recollection of receiving any money from the agent of appellee.

If insane when he received it, the money having been paid him in the midst of his family, whether he remained ignorant of the fact, after the restoration of his mind, and down to the time of the commencement of the suit, was a question of fact, which should have been submitted to the jury, as well as the question of his insanity at the time of the execution of the release.

For the errors of law above indicated, we think it safer to reverse the judgment, and remand the case, that the issues of fact may be again submitted to a jury, with proper instructions from the court.